IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 1, 2018

## IN RE BILLY C.

**Appeal from the Chancery Court for Hickman County**
**No. 17-CV-6171      James G. Martin, III, Chancellor**

_____

### No. M2018-00463-COA-R3-PT

_____

A trial court terminated a father's parental rights on the grounds of abandonment by willful failure to support, abandonment by willful failure to visit, and persistence of conditions. The father appealed, arguing that the evidence did not support the grounds for termination by clear and convincing evidence and that it was not in the child's best interest for his rights to be terminated. We reverse the trial court's judgment terminating the father's rights based on persistence of conditions because the child was not removed from the father's home by an order of the court, as Tenn. Code Ann. § 36-1-113(g)(3) requires. We affirm the trial court's judgment in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part and Reversed in Part**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and JOHN W. MCCLARTY, J., joined.

Richard Henry Boehms, Hohenwald, Tennessee, for the appellant, Billy J.C.

Shannon L. Crutcher, Franklin, Tennessee, for the appellees, Herbert L.W. and Candice E.W.

Gary W. Wicks, Sr., Franklin, Tennessee, Guardian Ad Litem.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

Billy J.C. ("Father") and Sandra C. ("Mother") are the parents of Billy C. ("Billy" or "the Child"), who was born in January 2014. Ms. E.W. is Father's cousin who looked after Billy whenever Father requested her help. On August 14, 2015, after Billy had been

living with her for five to six weeks, Ms. E.W. and her husband, Mr. L.W. (together, "Petitioners"), filed a petition for dependency and neglect in the Juvenile Court for Hickman County. The court entered an emergency ex parte custody order that same day awarding Petitioners temporary custody pending further orders of the court. On August 18, 2015, the court held a preliminary hearing during which it found probable cause to conclude that Billy was a dependent and neglected child.

A final adjudicatory hearing took place on November 6, 2015, and neither Mother nor Father appeared for this hearing. The court entered a final order on November 18, 2015, finding by clear and convincing evidence that Billy was dependent and neglected as a result of Mother's and Father's "willful ongoing criminal activity, their ongoing drug abuse, their continued instability and their failure to provide financial support, medical services, housing, clothing and education." The court ordered the Child to remain in the custody of Petitioners and ordered child support obligations to be assigned to Mother and Father through the Department of Children's Services. Mother and Father were "restrained and enjoined from interfering with the Petitioners' custodial rights and/or removing the child from the care of Petitioners and from the jurisdiction of this Honorable Court." The court further ordered that Mother and Father were to have "no parenting time pending further order of this Court." Father appealed the court's order finding Billy dependent and neglected, but the circuit court dismissed Father's appeal as untimely.

On September 28, 2017, Petitioners filed a petition to terminate Mother's and Father's parental rights and to adopt the Child. The grounds for termination include abandonment by willfully failing to visit or support the Child pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(i) and persistence of conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3). Neither Mother nor Father filed a response to the petition. A trial of this matter took place on January 3, 2018. Father's court-appointed attorney was present for the trial, but Father was not. Neither Mother nor an attorney acting on her behalf appeared for the trial. The court-appointed guardian ad litem was present to represent the Child's interests. Witnesses for Petitioners included Ms. E.W., Mr. L.W., Jeremy Taylor, and Ernie Moore.[1]

Ms. E.W. testified that Billy lived intermittently with Mother and Father at different hotels or in a motor vehicle for the first ten months or so of his life. When he was about ten months old, Father called to request that she come get Billy. Ms. E.W. testified that Father asked her on several occasions after this to come get Billy and that she took care of the Child for different periods of time until the summer of 2015. Ms. E.W. further testified that when Father first started calling her for help, she would take

---

[1]Mother is not a party to this appeal. As a result, we will not address the evidence introduced for the purpose of showing Mother's parental rights should be terminated and will not include the trial court's findings of fact or conclusions of law as they relate specifically to Mother.

care of Billy for a few days before returning him to Mother and Father. As time went on, however, the time periods when Billy stayed with her and her family grew longer and longer. On August 14, 2015, when Billy had been with Ms. E.W. and her family for five to six weeks, Ms. E.W. and her husband filed a petition for dependency and neglect in the Juvenile Court for Hickman County.

Ms. E.W. stated that Father never admitted to having a drug problem. However, based on her experience around individuals she knew to be under the influence of drugs or alcohol, she believed that Father was using illegal drugs and drinking too much alcohol. Ms. E.W. testified that neither Mother nor Father visited Billy or paid any form of child support for Billy for the period from May 27 through September 27, 2017. She stated that neither parent ever attempted to contact her about visiting Billy or paying support for him. Ms. E.W. was told that Father was working for Jarrett Fire Protection between May 27 and September 27, 2017. When she called the company in June or July 2017, however, Ms. E.W. was told that Father's employment had been terminated. Ms. E.W. was asked whether either parent filed any petitions with the court that resulted in Ms. E.W.'s having to appear regarding their visitation or payment of child support, and she responded "No."

Ms. E.W. testified that a criminal charge was pending against Father in Davidson County regarding his possession of contraband. She was not aware of where Father was living at the time of trial. Ms. E.W. also testified about an order of protection that had been taken out against Father that prevented him from contacting her or her children. She stated that the order of protection was issued in August 2015 and expired in August 2016. Ms. E.W. clarified that the order of protection prohibited Father from contacting her, but that the order did not preclude Father from having contact with Billy. Ms. E.W. stated that Father did not attempt to contact her about visiting Billy or paying any child support once the order of protection expired. When asked whether Father ever brought her any clothes, food, or anything else to help support Billy, Ms. E.W. replied, "No." She also said that she has seen Father "out in public and he has never asked about his child."

Ms. E.W. testified that Billy had health insurance through her policy with TennCare. She testified that her husband had his own company and that she worked as well. She was home in the afternoons, evenings, and on weekends. Ms. E.W. explained that she and her husband have two daughters who were aged twelve and fourteen at the time of trial and that she was interested in adopting Billy. She stated that she and her husband had the financial wherewithal to take care of Billy. Mr. L.W. affirmed his wife's testimony that his family was interested in adopting Billy and that they were financially able to provide for him.

Jeremy Taylor testified that he, Father, and Ms. E.W. are all first cousins. Mr. Taylor and Father were close growing up and spent time together until the latter part of 2017. Mr. Taylor explained that he stopped spending time with Father in 2017 because

Father "has a drug issue" and "won't straighten up" and Mr. Taylor did not want Father around his children. Another reason Mr. Taylor stopped spending time with Father was because Mr. Taylor believed Father had broken into the house of Mr. Taylor's mother in November 2017 and had stolen a ladder.

Mr. Taylor testified about Father and Mother's living conditions when Petitioners gained custody of Billy in 2015. Mr. Taylor stated that as far as he knew, Billy had resided since his birth either in a vehicle with his parents or with Petitioners. He explained that he saw Father, Mother, and Billy sleeping in a van in Father's grandmother's driveway near the fairgrounds at one point. Mr. Taylor testified that Father had a "lengthy criminal record" and that he had bailed Father out of jail in the past. Mr. Taylor stated that Father had used illegal drugs, including marijuana and "pills." When asked to put a timeframe on Father's illegal drug use, Mr. Taylor said "it's gone on for several - - as long as we've been an adult." Mr. Taylor testified that he has offered to pay for Father to go to a rehabilitation facility, but Father rejected this offer. In response to questions about where Father had lived over the past few years, Mr. Taylor stated that Father had lived with his father in Lascassas, with another woman in subsidized housing in Nashville, and in a van. Mr. Taylor was not aware of where Father was living at the time of trial. When asked whether he believed Father's situation at the time of trial was better, worse, or about the same as it was in 2015, Mr. Taylor replied that it was "definitely not better." He said it was "maybe even worse."

Mr. Taylor also testified about his observations of Billy in the home of Petitioners, who Mr. Taylor knew were interested in adopting Billy. Mr. Taylor stated that he had no concerns about the Child in their care, explaining that he saw Petitioners about once a week, either at their house or at Mr. Taylor's house, and that Billy always appeared well-cared for. Mr. Taylor stated, "I always try to get [Billy] to spend the night [at my house] and he - - he [says] no, I'm going home with mom and daddy."

Mr. Taylor testified that he worked as a fireman with the Nashville Fire Department. He ran a wholesale tire business in Nashville on his days off. Mr. Taylor testified that Father worked for him prior to November 2017 "at least a couple of days a week" and that he paid Father between $120 and $200 a day. If they just hauled tires, Mr. Taylor paid Father $120. If they cut grass after hauling tires, Mr. Taylor would pay Father between $150 and $200 a day, depending on how much grass they cut. Mr. Taylor stated that Father worked for him between May 27 and September 27, 2017, and that he paid Father between $1,000 and $1,500 a month during those four months. According to Mr. Taylor, Father had access to transportation and drove himself to work sometimes. Mr. Taylor was asked where Father had worked since November 2015, and Mr. Taylor responded that, in addition to working for him, Father worked for Century Fire Protection

and then for Jarrett Fire Protection. Mr. Taylor was uncertain of the dates of Father's employment with these companies.[2]

Ernie Moore was the process server who served Father with the termination petition. He testified that Father appeared to be living in low-income housing with a "young lady" who had a newborn child and that his residence was "a mess." Mr. Moore was asked if Father said anything to Mr. Moore upon being served, and Mr. Moore responded: "He said this is over as far as I'm concerned, and . . . he was telling the girl not to worry about it."

Following Petitioners' presentation of evidence, and after allowing the guardian ad litem and Father's attorney to question the witnesses, the trial court entered an order terminating Mother's and Father's parental rights to Billy and approving Petitioners' request to adopt Billy. The court found all witnesses who testified were credible and "relie[d] on the facts contained in their testimony as evidence." The court's findings of fact include the following, *inter alia*:

> On several occasions, the Petitioners met the Respondents to pick up [the Child] on Trinity Lane at rundown hotels in a high crime area of town. Mrs. [E.W.] observed the Respondents exhibit behavior she knew to be consistent with drug use. The Respondents had access to a vehicle.

> [The Child] began staying with the Petitioners more frequently and for longer durations. In June 2015, at 17 months old, [the Child] was left with the Petitioners for approximately five to six weeks. During this time, the Respondents did not call to check on [him]. The Petitioners did not know the Respondents' whereabouts. As a result, the Petitioners filed a Petition for Dependency and Neglect in the Hickman County Juvenile Court and requested emergency custody.

> . . . .

> On August 14, 2015, an Emergency Ex-Parte Custody Order removed [the Child] from the legal custody of the Respondents and placed custody with the Petitioners. Since then, [the Child] has remained in the care, custody and control of the Petitioners.

> . . . .

---

[2]The record includes Father's responses to Petitioners' interrogatories. In response to a question about his work history, Father stated that he worked for Jarrett Fire Protection installing sprinkler systems for approximately two months in 2017. He also stated that he worked for Mr. Taylor doing "general labor/odd jobs" on an as-needed basis, and that he earned $125 per day.

The Respondents are not currently living together. Since November 2015, [Father] has lived in his vehicle, in public housing and with his father. [Father] was recently living with a lady . . . at 1303 Edgehill Avenue, Nashville, Tennessee 37212. [Father] was served with process at this address by Ernie Moore ("Mr. Moore"). Mr. Moore described the residence as being in the projects off 12th Avenue in Davidson County. The interior of the home was a mess. Upon accepting service, [Father] told Mr. Moore this was over as far as he was concerned. It is unknown if [Father] still lives at this address.

. . . .

Until November 2017, [Father] maintained a close relationship with Jeremy Taylor ("Mr. Taylor"). [Father] and Mr. Taylor are first cousins. Around Thanksgiving, [Father] broke into the home of Mr. Taylor's mother. A ladder was taken from under the house. A few days later, Mr. Taylor made contact with [Father] on Nolensville Road and saw the missing ladder in his vehicle.

Since November 2015, Mr. Taylor has observed [Father] use marijuana and pills. Further, Mr. Taylor has witnessed [Father] exhibit behavior he knew to be consistent with drug use. Mr. Taylor unsuccessfully tried to get [Father] to enter an addiction treatment program.

Counsel stipulated the relevant period for purposes of abandonment in this case is May 27, 2017, until September 27, 2017. Between these dates, [Father] worked part time with Mr. Taylor. [Father] made between $1000.00 and $1500.00 per month. [Father] had access to a vehicle. For a portion of this time, [Father] worked full time for Jarrett Fire Protection. [Father] is capable of working.

[Father] answered Interrogatories under oath on July 24, 2017. [Father] admitted to working for Jarrett Fire Protection and Mr. Taylor. Further, he acknowledged being on probation for seven years. Despite being on probation, [Father] admitted to using heroin a couple of months earlier. [Father] has felony charges pending in Davidson County.

[Father's] driver's license is suspended. He does not maintain any financial accounts and does not own a vehicle. According to his Interrogatory responses, [Father] has approximately $835.00 per month in living expenses.

Between May 27, 2017, and September 27, 2017, [Father] had disposable income each month. Irrespective, neither he nor [Mother] paid support for [the Child] to the Petitioners. In fact, the Respondents have never paid support to the Petitioners.

Between May 27, 2017, and September 27, 2017, the Respondents did not visit or attempt to visit [the Child]. In fact, the Respondents have not seen [the Child] since June 2015. The Respondents had access to transportation. The Respondents have not filed a request to establish visitation with [the Child] since entry of the Final Order on November 18, 2015.

Mr. Taylor was asked whether the Respondents' current situation was better, worse or about the same as in 2015. Mr. Taylor testified it was not better and may be even worse.

[Father] was given the opportunity to change the circumstances that partially resulted in [the Child's] removal; however, he refused addiction treatment and has continued to use illegal drugs. [Father] has felony charges pending in Davidson County. . . . The Respondents have neither visited nor supported [the Child] since removal.

Mr. Taylor maintains a close relationship with the Petitioners. He visits them at least once a week. Mr. Taylor has tried get [the Child] to spend the night with him, but he refuses. [The Child] states, "I'm going home with mom and daddy." This is how [the Child] refers to the Petitioners. (Citations to the record omitted.)

After making the findings of fact set forth above, the trial court found by clear and convincing evidence that (1) Father abandoned Billy by willfully failing to pay child support during the four months preceding the filing of the petition to terminate his rights, (2) Mother and Father abandoned Billy by willfully failing to visit him during the four months preceding the filing of the petition, and (3) the conditions leading to Billy's removal and that prevent his safe return to Mother's and Father's care continue to persist. The trial court wrote:

The Court finds by clear and convincing evidence that [Father] abandoned [the Child] by his willful failure to support the Child. During the relevant four (4) month period, [Father] worked for Mr. Taylor. He earned between $1000.00 and $1500.00 per month. His living expenses averaged $835.00 per month. As such, [Father] had disposable income to support [the Child]. The Final Order entered by Judge Puckett on November 18, 2015, reflected support being set through Child Support Services. As such,

[Father] knew or should have known he had a continuing duty to support the child. Irrespective, [Father] intentionally and/or voluntarily failed to pay support with no justifiable excuse for his actions.

The Court finds by clear and convincing evidence that [Father] abandoned [the Child] by his willful failure to visit the Child. A parent's failure to visit may be excused by the acts of another only if those acts prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child. *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009). In this case, no one has committed acts which prevented [Father] from visiting the Child during the relevant four (4) month period. [Father] can blame only himself. [Father] has not seen [the Child] since June 2015. Since entry of the Final Order by Judge Puckett on November 18, 2015, [Father] has not filed any pleading to reinstate his visitation. [Father] knew or should have known he had a duty to visit the Child. [Father] had access to transportation. However, he intentionally and/or voluntarily failed to visit with no justifiable excuse for his actions.

. . . .

[The Child] was removed from the Respondents' home upon entry of the Emergency Ex Parte Custody Order on August 14, 2015. [The Child] has remained in the care, custody and control of the Petitioners since that time — a period exceeding six (6) months. [The Child's] removal was premised on the Respondents' ongoing criminal activity, drug abuse, instability, and failure to provide financial support, medical care, housing, clothing and education.

The Court finds by clear and convincing evidence that the conditions leading to [the Child's] removal and that prevent his safe return to the care of the Respondents still persist. [The Child] was removed from the Respondents over two years ago and they continue to engage in the same or similar conduct that caused his removal. There is little likelihood these conditions will be remedied at an early date so that the child can be safely returned to the Respondents. Further, continuation of the parent and child relationship will greatly diminish [the Child's] chances of early integration into a safe, stable and permanent home.

The court then conducted a best interest analysis and found by clear and convincing evidence that terminating Mother's and Father's parental rights was in Billy's best interest.

Father appeals from the trial court's order, arguing that the court erred in ruling (1) that the evidence clearly and convincingly supported any of the three grounds on which the court based its termination of his rights and (2) that termination of his rights was in Billy's best interest. Mother did not appeal the termination of her rights.

## II. STANDARD OF REVIEW

The Tennessee Supreme Court has described the appellate review of parental termination cases as follows:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017).

The termination of a parent's rights is one of the most serious decisions courts make. As the United States Supreme Court has said, "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *Santosky v. Kramer*, 455 U.S. 745, 787 (1982). "Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger," *In re W.B., IV*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *6 (Tenn. Ct. App. Apr. 29, 2005), and of "severing forever all legal rights and obligations of the parent or guardian," Tenn. Code Ann. § 36-1-113(l)(1).

A parent has a fundamental right, based in both the federal and state constitutions, to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995) (citing *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993)). This right "is among

the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d at 521 (citing U.S. CONST. amend. XIV, § 1; TENN. CONST. art. 1, § 8). While this right is fundamental, it is not absolute. *Id.* at 522. The State may interfere with parental rights only in certain circumstances. *Id.*; *In re Angela E.*, 303 S.W.3d at 250. Our legislature has listed the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and a parent's rights may be terminated only where a statutory basis exists, *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must find by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "'Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings.'" *In re Carrington H.*, 483 S.W.3d at 522 (quoting *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted)). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). As a reviewing court, we "must 'distinguish between the specific facts found by the trial court and the combined weight of those facts.'" *In re Keri C.*, 384 S.W.3d 731, 744 (Tenn. Ct. App. 2010) (quoting *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007)). Then, we must determine "whether the combined weight of the facts . . . clearly and convincingly establishes all of the elements required to terminate" Father's parental rights. *Id.* (citing *In re Tiffany B.*, 228 S.W.3d at 156, and *In re S.M.*, 149 S.W.3d 632, 640 (Tenn. Ct. App. 2004)). "When a trial court has seen and heard witnesses, considerable deference must be accorded to the trial court's findings as to witnesses' credibility." *Id.* (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)).

Once a ground for termination is established by clear and convincing evidence, the trial court or the reviewing court conducts a best interests analysis. *In re Angela E.*, 303 S.W.3d at 251 (citing *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005), and *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004)). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *Id.* at 254. The existence of a ground for termination "does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006).

III. ANALYSIS

A. Grounds for Termination

    1. Abandonment by Failure to Support

One of the grounds the legislature has determined constitutes a basis for terminating an individual's parental rights is "abandonment," as that term is defined in Tenn. Code Ann. § 36-1-102. Tenn. Code Ann. § 36-1-113(g)(1). Section 36-1-102(1)(A)(i) defines abandonment, in part, as a parent's willful failure to support or make reasonable payments towards the support of a child for a period of four consecutive months immediately preceding the filing of a termination petition.[3] A parent's "support" or "reasonable payments toward such child's support" must be "more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). "Token support" is defined as "support, under the circumstances of the individual case, [that] is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). Petitioners filed the petition to terminate Father's parental rights on September 28, 2017. The parties stipulated that the relevant four-month period to determine whether Father willfully abandoned Billy by failing to support or visit him runs from May 27 through September 27, 2017.[4]

"Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent." *In re Audrey S.*, 182 S.W.3d at 863. A parent's failure to support is "willful" if he or she '"is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing the support."' *Dep't of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 524 (Tenn. Ct. App. 2004) (quoting *In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *5 (Tenn. Ct. App. Nov. 25, 2003)).

> The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly,

---

[3]The statute defining "abandonment" was amended effective July 1, 2018; as amended, Tenn. Code Ann. § 36-1-102(1)(A) no longer includes the term "willful" in its definition of "abandonment." Instead, Tenn. Pub. Ch. 875, § 2, codified at Tenn. Code Ann. § 36-1-102(1)(I), makes the absence of willfulness an affirmative defense to abandonment for failure to visit or support. To establish this defense, the parent (or guardian) must prove by a preponderance of the evidence that the failure to visit or support was not willful. Because this change is substantive rather than procedural or remedial, however, the amended statute will not be applied retroactively to this case. *In re D.A.H.*, 142 S.W.3d 267, 273 (Tenn. 2004).

[4]We note that this stipulation is incorrect. The beginning date for the four-month period should be May 28, 2017. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014). In this case, the error makes no difference to the analysis or the outcome.

> triers-of-fact must infer intent from the circumstantial evidence, including a
> person's actions or conduct.

*In re Audrey S.*, 182 S.W.3d at 863 (citations omitted). If a parent's failure to support is out of his or her control, that parent's failure will not be deemed "willful." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013). Whether a parent has failed to support a child is a question of fact, but whether a parent's failure to support a child was willful is a question of law. *Id.*; *see also In re Alysia S.*, 460 S.W.3d 536, 566 (Tenn. Ct. App. 2014).

As the parties filing the termination petition, Petitioners had the burden of proving by clear and convincing evidence that Father abandoned the Child by willfully failing to support or to make reasonable payments toward his support during the relevant four-month period. *In re Bernard T.*, 319 S.W.3d at 596; *see* Tenn. Code Ann. § 36-1-102(1)(A)(i). Petitioners were required to prove that Father "had the capacity to pay support but made no attempt to do so and did not possess a justifiable excuse." *In re Adoption of Angela E.*, 402 S.W.3d at 641.

Father contends he was not aware of his duty to support his child. However, the juvenile court's final order adjudicating Billy dependent and neglected on November 18, 2015, ordered that "child support obligations shall be assigned to [Father] through the Department of Child Services." The record does not reflect whether the Department of Children's Services ever established a child support schedule for Billy, but the order put Father on notice that he was required to pay child support. Father asserts that he was not properly served with this order by the juvenile court, yet Father appealed the order to the Circuit Court for Hickman County. Regardless of whether or not Father was aware of this order, however, the legislature presumes a parent who is at least eighteen years old is aware of his or her legal obligation to support his or her child, even if there is no court order requiring the parent do so. Tenn. Code Ann. § 36-1-102(1)(H); *see also In re Braxton M.*, 531 S.W.3d 708, 724 (Tenn. Ct. App. 2017) ("[I]t is well settled in Tennessee that every parent is presumed to have knowledge of a parent's duty to support his or her minor children regardless of whether a court order to that effect is in place."); *David A. v. Wand T.*, No. M2013-01327-COA-R3-PT, 2014 WL 644721, at *8 (Tenn. Ct. App. Feb. 18, 2014); *In re Michaela V.*, No. E2013-00500-COA-R3-PT, 2013 WL 6096367, at *8 (Tenn. Ct. App. Nov. 19, 2013) (holding that a parent is not excused from paying child support based on the absence of a court order requiring such payment).

The record shows that Father earned between $1,000 and $1,500 per month working for Mr. Taylor during the relevant four-month period. The record shows that Father also worked for Jarrett Fire Protection and Century Fire Protection, but it is not clear when he worked for these entities, and there is no evidence of the amount Father earned working for either company. The trial court's finding that Father's monthly

expenses averaged $835 is supported by the record.[5]  Despite knowing that Billy was staying with Petitioners, the evidence shows that Father never paid or offered to pay anything towards the support of Billy.  Based on the undisputed evidence, we find that Petitioners have shown by clear and convincing evidence that Father had the ability to pay child support for Billy, but that he made no attempt to do so and had no justifiable excuse for not doing so.  Thus, we affirm the trial court's determination that the evidence was clear and convincing that Father abandoned Billy by willfully failing to pay child support in the four months preceding the filing of the petition to terminate his rights.

### 2.  Abandonment by Failure to Visit

Similar to the termination ground of abandonment by failure to support, Tenn. Code Ann. § 36-1-102(1)(A)(i) also defines abandonment as a parent's willful failure to visit a child for a period of four consecutive months immediately preceding the filing of a termination petition.  The evidence is undisputed that Father did not visit Billy in the four-month period preceding Petitioners' filing of the termination petition.  Father contends that his failure to visit was not willful, pointing out that in the final order dated November 18, 2015, adjudicating Billy dependent and neglected, the juvenile court ordered that Father was to have "no parenting time pending further order of this Court."  Petitioners did not file their petition to terminate Father's parental rights until nearly two years later, on September 28, 2017.  The record contains no evidence that Father ever filed a motion with either the juvenile court or the chancery court following the November 2015 order requesting parenting time with Billy.

Father also points to the order of protection that was in effect from August 2015 through August 2016 to show that his failure to visit Billy was not willful.  Ms. E.W. testified, however, that although the order of protection prevented Father from contacting her or her children from August 2015 until August 2016, the order did not preclude Father from having contact with Billy.  Further, the evidence is undisputed that once the order of protection expired in August 2016, Father made no effort to try to see Billy.  As far as Ms. E.W. was aware, Father had not seen Billy since 2015, when Father called Ms. E.W. and asked her to come get Billy.

A parent need not be aware of the consequences resulting from his or her failure to visit his or her child for the failure to visit to be "willful."  *In re M.L.P.*, 281 S.W.3d 387, 392 (Tenn. 2009).  "Persons are presumed to know the law, and parents should know that they have a responsibility to visit their children."  *Id.* (citations omitted).  Mr. Taylor testified that Father had access to transportation during the relevant four-month period.

---

[5]Father argues in his brief that in addition to the monthly food expense of $400-$500 he listed in his interrogatory response, he also paid $150 per month in food/snack costs for another of his children. However, this argument is inconsistent with Father's interrogatory response that the $400-$500 food expense did, in fact, include the $150 per month he paid for this other child's food/snacks.

The evidence reveals that Father made no attempt to visit Billy during the relevant time period and that he did not file any motions seeking visitation with Billy. We thus find the evidence clearly and convincingly proves that Father abandoned Billy by willfully failing to visit him in the four-month period preceding the filing of the termination petition and affirm the trial court's determination that Father's rights could be terminated on this ground.

### 3. Persistence of Conditions

In addition to the other grounds, the trial court based its decision to terminate Father's parental rights on the ground commonly referred to as "persistence of conditions." The requirements for this ground include the following:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3) (2017).[6]

The version of the statute in effect when the termination petition was filed applied only to situations where a court had entered an order removing the child at issue from a parent's custody due to dependency, neglect, or abuse. *In re Audrey S.*, 182 S.W.3d at 874. Father argues that the trial court erred in terminating his rights based on the

---

[6]This statute was amended effective July 1, 2018, expanding its reach. *See* Tenn. Pub. Ch. 875, § 2. As amended, the persistence of conditions ground applies to situations in which the child "has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child." Tenn. Code Ann. § 36-1-113(g)(3)(A). Because this change is substantive rather than procedural or remedial, the amended statute will not be applied retroactively to this case. *In re D.A.H.*, 142 S.W.3d at 273.

persistence of conditions ground because Billy was not removed from his home by an order of the court, as the statute required.  We agree.  Ms. E.W. testified that when she and her husband filed the petition asking the juvenile court to find Billy was dependent and neglected, Billy had been living with them for five to six weeks because Father had asked Petitioners for help caring for Billy.  The juvenile court entered an order awarding Petitioners temporary custody, but the court did not enter an order removing Billy from Father's home.  Billy was not living with Father when the juvenile court determined that he was dependent and neglected.  As we held in the case *In re Mickia J.*, No. E2016-00046-COA-R3-PT, 2016 WL 5210794, at *5 (Tenn. Ct. App. Sept. 19, 2016):

> [E]ven if this record contained an order adjudicating the child to be dependent and neglected, as a threshold requirement for applicability of the ground of persistence of conditions in termination of parental rights cases, the child must not only have been adjudicated dependent and neglected, but he or she must also have been removed from the defendant parent's home.

*See In re Destaney D.*, No. E2014-01651-COA-R3-PT, 2015 WL 3876761, at *6 (Tenn. Ct. App. June 23, 2015) (holding that persistence of conditions ground does not apply where the record contains no order removing the children from the home of the parent whose rights are at issue); *see also In re B.P.C.*, No. M2006-02084-COA-R3-PT, 2007 WL 1159199, at *7 (Tenn. Ct. App. Apr. 18, 2007).  Because Billy was not removed from Father's home by an order of the court, we reverse the trial court's holding that Father's parental rights could be terminated based on the persistence of conditions ground.

## B.  Best Interests Analysis

Having found that clear and convincing evidence exists to terminate Father's parental rights, we next consider whether the trial court properly determined that termination of his rights is in the Child's best interest.  *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860.  "Facts relevant to a child's best interests need only be established by a preponderance of the evidence, although [Petitioners] must establish that the combined weight of the proven facts amounts to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535 (citing *In re Kaliyah S.*, 455 S.W.3d at 555).

The factors a trial court is to consider in determining whether terminating a parent's rights to a child is in the child's best interests are set forth in Tenn. Code Ann. § 36-1-113(i).  The trial court conducted a best interests analysis, reviewing each of the factors set forth in the statute and applying them to the facts of this case:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

The Court finds this factor weighs in favor of terminating the Respondents' parental rights. The Respondents have continued to engage in the same conduct that precipitated [Billy's] removal making it unsafe and contrary to his best interest to be in the home of the Respondents.

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

The Court finds this factor weighs in favor of terminating the Respondents' parental rights. The Respondents, as a matter of fact, have failed to make a lasting adjustment of circumstances. [Father] had the opportunity to go to addiction treatment but refused. . . . Therefore, the Court finds that a lasting adjustment does not reasonably appear possible.

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

The Court finds this factor weighs in favor of terminating the Respondents' parental rights. There has been no contact between the Respondents and [Billy] since June 2015. The Court recognizes the Respondents' visitation was suspended pending entry of further orders. However, the Respondents had the ability to seek visitation and failed to do so. Therefore, regular visitation or contact has not occurred.

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

The Court finds this factor weighs in favor of terminating the Respondents' parental rights. Well over two years of no contact is a significant length of time for a child who is now four years old. Based on this fact alone, it is virtually impossible to conclude that a meaningful relationship exists between the Respondents and [Billy]. Further, it is a leap to think that a meaningful relationship existed prior to [the Child's] removal. The child was left for significant periods of time with others including, without limitation, the Petitioners. [Billy] does not know the Respondents.

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

The Court finds this factor weighs in favor of terminating the Respondents' parental rights. [Billy] refers to the Petitioners as mom and daddy. He does not want to be away from them. The Petitioners' home is the only home [Billy] knows. In fact, he will not even stay the night with Mr. Taylor. Returning [Billy] to the care of the Respondents would likely have a profoundly negative effect on [the Child's] emotional and psychological well-being.

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

The Court finds this factor weighs in favor of terminating the Respondents' parental rights. [Billy] was found to be a dependent and neglected child due to the actions and/or inactions of the Respondents.

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

The Court finds this factor weighs in favor of terminating the Respondents' parental rights. It is unknown where the Respondents currently live. However, there is ample evidence to suggest they are engaged in criminal activity and illegal drug use that would render them unable to care for [Billy] in a safe and stable manner.

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; . . .

The Court places no weight on this factor. There was no proof presented as to the Respondents' mental and or emotional status.

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

The Court finds this factor weighs in favor of terminating the Respondents' parental rights. There was no proof presented as to what child support would be under the child support guidelines. Irrespective, the Respondents did not pay any support. (Citation to the record omitted.)

We note that the record contains no evidence that any social services agencies have been involved with helping Father "effect a lasting adjustment," as factor two of the best interest analysis assumes. Mr. Taylor testified, however, that he offered to pay for Father to undergo rehabilitation to treat his drug problem, but that Father refused such assistance. The statute does not require that every factor be satisfied before a court can hold that termination is in a child's best interest. *In re K.E.D.M.*, No. E2008-00150-COA-R3-PT, 2008 WL 3982910, at *4 (Tenn. Ct. App. Aug. 27, 2008).

Father relies on the case *In re K.E.D.M.* to argue that the trial court erred in holding that termination of his parental rights is in Billy's best interests. As Father points out, the mother at issue in *In re K.E.D.M.* tested positive for marijuana when the child was born, she admitted to using methamphetamine and amphetamine when the child was less than a year old, she lost unsupervised visits when she allowed other drug users to share her home after telling the court that she was not living with anyone else, and a gun was fired outside the mother's home to break up an argument while the child was still residing with the mother. *In re K.E.D.M.*, 2008 WL 3982910, at *1. Despite these issues, the Court of Appeals reversed the trial court's judgment finding that termination of the mother's rights was in the child's best interest. *Id.* at *6. Unlike the present case, however, the mother in *In re K.E.D.M.* had provided clean drug tests for over a year by the time of trial, she had completed two outpatient drug rehabilitation programs and a 30-day inpatient drug program, and she had relocated to move away from her problematic relatives. *Id.* at *4. In addition, the mother paid child support, she maintained a regular visitation schedule with her child, and a strong bond had been formed between the mother and her child. *Id.* at *5. Explaining the reasons we reversed the trial court's judgment regarding the child's best interest in that case, we wrote:

Considering the totality of the circumstances as required under Tenn. Code Ann. § 36-1-113(i), it appears that Mother has made numerous mistakes and, on several occasions, exercised poor judgment, but to her credit has, with the assistance of DCS, substantially rehabilitated herself. While there have been several "bumps" in the road during Mother's journey of rehabilitation, we conclude that Mother has made significant progress. She completed the requirements of the permanency plan, maintained a job for over a year, gained a work promotion, paid child support, completed two outpatient drug programs, completed a 30-day inpatient drug program, maintained regularly scheduled visitation with Child, has an appropriate place to live, and has not tested positive for illegal drugs since September 2006.

*Id.* at *6.

Unlike the steps the mother took to turn her life around and establish a bond with her child in *In re K.E.D.M.*, Father is unable to point to any steps he has taken to improve his own living situation or establish a relationship with Billy. Father did not even make the effort to appear for the trial despite the fact that his court-appointed attorney was present and did his best to protect Father's interests. Ernie Moore, the individual who served Father with Petitioners' termination petition, testified that Father's residence was "a mess" and that Father told Mr. Moore "this is over as far as I'm concerned." Mr. Moore stated that Father told the woman with whom he appeared to be living "not to worry about it" when Mr. Moore served Father with the termination petition. When Mr. Taylor was asked at the trial whether Father's condition had improved since 2015, Mr. Taylor responded that Father's condition was "definitely not better," and that it was "maybe even worse." Ms. E.W. testified that a criminal charge was pending against Father at the time of trial in Davidson County regarding his possession of contraband.

We conclude that the trial court's findings with respect to the best interests analysis are supported by a preponderance of the evidence and that the evidence clearly and convincingly establishes that terminating Father's parental rights is in Billy's best interest.

## IV. CONCLUSION

The judgment of the trial court is affirmed in part and reversed in part. We affirm the trial court's termination of Father's parental rights based on the grounds of abandonment by willfully failing to visit and abandonment by willfully failing to support, but we reverse the trial court's termination of Father's rights on the ground of persistence of conditions. This matter is remanded with costs of appeal assessed against the appellant, Billy J.C., for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE